# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

State of South Carolina, Respondent,

v.

Conrad Lamont Slocumb, Petitioner.

Appellate Case No. 2015-002031

---

## IN THE ORIGINAL JURISDICTION

---

Opinion No. 27877
Heard December 12, 2018 – Filed April 3, 2019

---

## RELIEF DENIED

---

Tara Dawn Shurling, of the Law Office of Tara Dawn
Shurling, P.A., of Columbia, for Petitioner.

Attorney General Alan Wilson and Assistant Attorney
General Mark R. Farthing, both of Columbia, for
Respondent.

Chief Appellate Defender Robert Micheal Dudek,
Appellate Defender Susan Barber Hackett, Appellate
Defender Laura Ruth Baer, all of Columbia, for Amicus
Curiae, South Carolina Division of Appellate Defense.

John H. Blume, III and Lindsey Sterling Vann, both of
Columbia, for Amicus Curiae, Justice 360 & Cornell
Juvenile Justice Project.

Executive Director James Hugh Ryan, III, of Columbia, for Amicus Curiae, South Carolina Commission on Indigent Defense.

Joseph M. McCulloch, Jr., of Columbia, and Seth P. Waxman, of Washington, DC, for Amicus Curiae, The South Carolina State Conference of the National Association for the Advancement of Colored People.

Alexandra V.B. Gordon, Aidan Synnott, Anne O'Toole and Agbeko C. Petty, all of New York, NY, for Amicus Curiae, South Carolina Public Defender Association and South Carolina Criminal Association of Criminal Defense Lawyers.

---

**JUSTICE KITTREDGE:** At the age of thirteen, petitioner Conrad Slocumb kidnapped and sexually assaulted a teacher before shooting her in the face and head five times and leaving her for dead. Three years later, following his guilty plea for the first set of crimes, he escaped from custody and raped and robbed another woman in a brutal manner before being apprehended again. For these two sets of crimes, Slocumb received an aggregate 130-year sentence due to the individual sentences being run consecutively.

Following rounds of direct appeals and collateral proceedings, Slocumb now contends an aggregate 130-year sentence for multiple offenses committed on multiple dates violates the Eighth Amendment to the United States Constitution, as extrapolated from the principles set forth in the United States Supreme Court's (Supreme Court) decisions in *Graham v. Florida*[1] and *Miller v. Alabama*,[2] among others. We acknowledge ostensible merit in Slocumb's argument, for it is arguably a reasonable extension of *Graham* and *Miller*. Yet precedent dictates that only the

---

[1] 560 U.S. 48 (2010) (prohibiting courts from imposing a sentence of life without the possibility of parole on a juvenile offender convicted of a nonhomicide offense).

[2] 567 U.S. 460 (2012) (holding mandatory life without parole sentences for juveniles convicted of homicide offenses violated the Eighth Amendment's prohibition against cruel and unusual punishments).

Supreme Court may extend and enlarge the protections guaranteed by the United States Constitution. Once the Supreme Court has drawn a line in the sand, the authority to redraw that line and broaden federal constitutional protections is limited to our nation's highest court. Because the decision to expand the reach and protections of the Eighth Amendment lies exclusively with the Supreme Court, we are constrained to deny Slocumb relief.

## I.

In 1992, when he was thirteen years old, Slocumb accosted a high school teacher in the school parking lot and forced her into her car at gunpoint, directing her to drive to a wooded area. Slocumb unsuccessfully attempted to force the teacher into the woods before grabbing her, squeezing her breast, and digitally penetrating her vagina through her clothing. He then shot the teacher in the face and head five times and drove off in her car, leaving her on the side of the road. Miraculously, the teacher survived and identified Slocumb as the perpetrator. Eventually, Slocumb pled guilty to criminal sexual conduct in the first degree (CSC-1st) in exchange for the remaining charges being *nol prossed* and was sentenced to thirty years' imprisonment.

Three years later, while returning from an off-site medical visit, Slocumb escaped from custody for a total of forty-five minutes. In the short time he was free, he ran to a nearby apartment complex, located a lone woman, and forced his way into her apartment. Once inside, Slocumb claimed he had a gun and demanded the woman turn over her car keys, money, jewelry, cigarettes, beer, and a change of clothes. After the woman complied with his demands, Slocumb forced her to undress, said "I'm going to have some sex," and, after reminding her he was armed, proceeded to rape her. The woman nonetheless continued to resist, whereupon Slocumb forced her to stand and touch her toes as he raped her from behind. After the rape, Slocumb left the apartment and was apprehended in the parking lot by law enforcement.

After a jury trial and multiple rounds of direct appeals, post-conviction relief applications, and resentencing hearings, Slocumb was ultimately sentenced to life without parole for burglary in the first degree, thirty years' imprisonment for CSC-1st, thirty years' imprisonment for kidnapping, fifteen years' imprisonment for robbery (as a lesser-included offense to armed robbery), and five years' imprisonment for escape, the sentences to be served consecutively.

Subsequently, in 2010, the United States Supreme Court handed down its decision in *Graham v. Florida*, in which it held the Eighth Amendment to the United States

Constitution prohibited courts from sentencing a juvenile offender convicted of a nonhomicide offense to life without parole.  560 U.S. at 82.  Slocumb immediately filed a federal habeas action, requesting his life sentence for burglary be vacated pursuant to *Graham*.   The federal district court granted him relief and remanded the case to the circuit court for resentencing on the burglary charge alone.

On remand, Slocumb requested the circuit court not only resentence him on the burglary charge, but also vacate the remaining eighty-year aggregate sentence for the other crimes and resentence him on all of the charges in accordance "with the spirit and intent of" *Graham* and *Miller*.  Acknowledging that a *de facto* life sentence[3] is not expressly prohibited under *Graham* or *Miller*, Slocumb invited the circuit court to follow the spirit of *Graham* and *Miller* and find his aggregate term-of-years sentence was impermissible under the Eighth Amendment.  In addition, Slocumb asserted even if his new burglary sentence were run concurrently to his eighty-year aggregate sentence for the remaining crimes, the eighty-year sentence would also not provide him with a meaningful opportunity for release, as specified in *Graham*, because he would be incarcerated long past his projected life expectancy.

In response, the State stressed *Graham* specifically allowed a state to keep a juvenile offender incarcerated for his entire natural life span when the offender failed to demonstrate maturity or rehabilitation.  The State informed the circuit court that it had been contacted by the Department of Corrections (DOC) and told that Slocumb, as an adult in his thirties, was an enormous "security risk" with a "horrible" behavioral record, including 218 infractions over a sixteen-year period for actions such as attacking corrections workers, possession of a weapon, and mutilation.  According to the State, the DOC's unsolicited contact was the first time in at least twenty-three years the agency had felt it necessary to specifically advise the State of the potential security risk posed by an inmate.[4]  The State also informed the circuit court Slocumb had failed to complete any educational courses

---

[3] *See Bunch v. United States*, 685 F.3d 546, 552 (6th Cir. 2012) (describing a *de facto* life sentence as one that is expressed as a lengthy term of years, causing the defendant's eligibility for parole or release to fall outside his projected life expectancy).

[4] Similarly, the solicitor who prosecuted Slocumb for the offenses committed when he was sixteen years old testified Slocumb was "the most violent sexual predator [she] ha[d] ever prosecuted."

or enroll in any rehabilitative programs while incarcerated.[5]  The State argued Slocumb's poor disciplinary record and failure to attempt to rehabilitate himself fell squarely within *Graham*'s language allowing a juvenile offender convicted of a nonhomicide offense to be imprisoned for his natural life span.  Stated differently, Slocumb's adult prison record of continuing impulsivity and violence belies the general premises of youth articulated in *Roper v. Simmons*,[6] *Graham*, and *Miller*.

Ultimately, the circuit court found the remand instructions from the federal court encompassed only Slocumb's burglary charge.  The court then resentenced Slocumb to fifty years' imprisonment on the burglary charge, the sentence to be run consecutively to the eighty years for the remaining charges, resulting in Slocumb facing a 130-year aggregate sentence.

Slocumb appealed, arguing the sentence violated the spirit and letter of *Graham*, but the court of appeals affirmed.  Slocumb then filed a petition for a writ of certiorari with this Court.  Because the court of appeals considered only the sentence for burglary in accordance with the limited remand instructions from the federal district court, we denied the petition.  However, because the certiorari petition sought review of the entire 130-year sentence, we observed that the constitutionality of the length of Slocumb's aggregate sentence in light of *Graham* was more appropriately raised to this Court by way of a petition for a writ of certiorari in our original jurisdiction.  As a result, Slocumb refiled a petition for a writ of certiorari in the Court's original jurisdiction to address whether an aggregate sentence imposed for multiple nonhomicide offenses committed while Slocumb was a juvenile was the equivalent of a sentence of life without the possibility of parole, and if so, whether the aggregate sentence violated the Eighth Amendment as interpreted by *Graham*.  We granted the petition.

## II.

In the past fourteen years, the Supreme Court issued three decisions concerning juvenile sentencing practices:  *Roper v. Simmons*, *Graham v. Florida*, and *Miller v. Alabama*.  We begin our analysis with a review of this trilogy of cases.

---

[5] According to the DOC's website, Slocumb still has not earned any education credits while incarcerated.

[6] 543 U.S. 551 (2005) (finding the Eighth and Fourteenth Amendments to the United States Constitution forbid the imposition of the death penalty on juvenile offenders).

## A.

In the earliest of its three recent decisions, *Roper v. Simmons*, the Supreme Court held juvenile offenders could not be sentenced to death if they were under the age of eighteen at the time they committed their crimes.  543 U.S. at 568, 578. Underlying the Supreme Court's holding was its belief that juveniles were fundamentally different from adults, in that they (1) exhibited a lack of maturity and an underdeveloped sense of responsibility, resulting in impetuous and ill-considered actions and decisions; (2) were more susceptible to negative outside influences such as peer pressure; and (3) had personality traits that were more transitory and less fixed than adults.  *Id.* at 569–70.  Consequently, as the Supreme Court explained, a juvenile's irresponsible conduct was not as morally reprehensible as that of an adult and less indicative of an irretrievably depraved character.  *Id.*  The Supreme Court concluded that as a result of juveniles' diminished culpability, the penological justifications for the death penalty applied to them with less force than to adults, and therefore the death penalty was an ineffective and inappropriate punishment for juvenile offenders.  *Id.* at 571.

## B.

Subsequently, in *Graham v. Florida*, the Supreme Court expanded upon its rationale in *Roper* and held the Eighth Amendment prohibited "the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." 560 U.S. at 82.  As a result of the differences between juveniles and adults outlined in *Roper* and the perceived moral distinction between homicide and nonhomicide crimes, the Supreme Court concluded that, as compared to an adult murderer, a juvenile nonhomicide offender who did not kill or intend to kill had a "twice diminished moral culpability."  *Id.* at 69.

Turning to the appropriate punishment for juvenile nonhomicide offenders, the Supreme Court noted a life without parole sentence was the second most severe penalty permitted by law and shared key features with a death sentence "that are shared by no other sentence," most importantly, the certainty the defendant will die in prison.  *Id.* at 69–70.  The Supreme Court discounted the penological justifications—retribution, deterrence, incapacitation, and rehabilitation—for sentencing a juvenile nonhomicide offender to life without parole because juveniles have diminished culpability, are less likely to take possible punishment into consideration when making decisions, and cannot be reliably classified as incorrigible at a young age.  *Id.* at 71–75.

As a result, the Supreme Court held "that for a juvenile offender who did not

commit homicide[,] the Eighth Amendment forbids the sentence of *life without parole*." *Id.* at 74 (emphasis added). Further,

> A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment prohibits a State from imposing *a life without parole sentence* on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society.

*Id.* at 75 (emphasis added).

In dissent, Justice Alito clarified his understanding of the majority's holding, stating that "*[n]othing in the Court's opinion affects the imposition of a sentence to a term of years without the possibility of parole*. Indeed, petitioner conceded at oral argument that a sentence of as much as 40 years without the possibility of parole 'probably' would be constitutional." *Id.* at 124 (Alito, J., dissenting) (emphasis added); *id.* at 123 n.13 (Thomas, J., dissenting) (making a similar observation). The majority in no way acknowledged or responded to either Justice Alito's or Justice Thomas's statements that the majority holding did not apply to juvenile offenders serving lengthy term-of-years sentences.

### C.

Finally, in *Miller v. Alabama*, the Supreme Court held that the Eighth Amendment forbade states from imposing on juveniles mandatory sentences of life without the possibility of parole for homicide offenses. 567 U.S. at 489. The Supreme Court reiterated that *Roper* and *Graham* stood for the principle that juveniles are constitutionally different from adults for sentencing purposes due to their diminished culpability and greater prospects for reform. *Id.* at 471–72. Relevant

to this appeal, the Supreme Court stated:

> *Graham*'s flat ban on **life without parole** applied only to nonhomicide crimes, and the Court took care to distinguish those offenses from murder, based on both moral culpability and consequential harm. But none of what it said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific. . . . So *Graham's* reasoning implicates any **life-without-parole sentence** imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses.

*Id.* at 473 (bold emphasis added) (internal citations omitted).[7]

## III.

At his resentencing hearing following the grant of federal habeas relief, Slocumb conceded to the circuit court that *Graham* applied only to *de jure* life sentences. Nonetheless, he now argues the general rationale underlying *Graham* requires us to extend its protections to juveniles serving *de facto* life sentences as well. We agree *Graham*'s explicit holding applies to *de jure* life sentences alone, and its rationale *may* implicate *de facto* life sentences. *See Miller*, 567 U.S. at 473 ("*Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile . . . ."). Nonetheless, several factors caution us against extending the reach

---

[7] Subsequently, in *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), the Supreme Court held its decision in *Miller* announced a new substantive rule of federal constitutional law and was to be applied retroactively. To receive relief, Slocumb must establish the *Graham* decision applies retroactively as well. *See Teague v. Lane*, 489 U.S. 288, 310 (1989). The Supreme Court has never explicitly held *Graham* applies retroactively. However, using our well-established retroactivity analysis, we conclude *Graham*—like *Miller*—applies retroactively because it sets forth a new substantive rule that excludes a certain class of defendants (juvenile nonhomicide offenders) from specific punishment (sentences of life without parole). *See generally Aiken v. Byars*, 410 S.C. 534, 539–44, 765 S.E.2d 572, 575–77 (2014) (setting forth South Carolina's retroactivity analysis and applying it to find discretionary life without parole sentences for juvenile homicide offenders were unconstitutional absent individualized hearings that accounted for the hallmark features of youth, as set forth in *Miller*); *see also In re Williams*, 759 F.3d 66, 70 (D.C. Cir. 2014) (concluding *Graham* applied retroactively to cases on collateral review); *Moore v. Biter*, 725 F.3d 1184, 1190 (9th Cir. 2013) (same).

of *Graham* to provide Slocumb with relief without further input from the Supreme Court.

## A.

First, a long line of Supreme Court precedent prohibits us from extending federal constitutional protections beyond the boundaries the Supreme Court itself has set. *See, e.g.*, *Arkansas v. Sullivan*, 532 U.S. 769, 772 (2001) (per curiam) ("The Arkansas Supreme Court's alternative holding, that it may interpret the United States Constitution to provide greater protection than this Court's own federal constitutional precedents provide, is foreclosed by *Oregon v. Hass*, 420 U.S. 714 (1975)."); *Hass*, 420 U.S. at 719 & n.4 (stating that while "a State is free *as a matter of its own law* to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards," it "may not impose such greater restrictions as a matter of *federal constitutional law* when this Court specifically refrains from imposing them"). As a result, we do not believe it is appropriate for this Court, as an inferior court, to extend federal constitutional protections under the Eighth Amendment beyond the boundaries the Supreme Court set in *Graham*.[8]

Stated differently, while we are duty-bound to enforce the Eighth Amendment consistent with the Supreme Court's directives, our duty to follow binding precedent is fixed upon case-specific holdings rather than general expressions in an opinion that exceed the scope of any particular holding. *Vasquez v. Commonwealth*, 781 S.E.2d 920, 926 (Va. 2016), *cert. denied*, 137 S. Ct. 568 (2016). This is not a subtle distinction, as Chief Justice Marshall long ago emphasized its importance to the judicial process, explaining:

> It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. *If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision*. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other

---

[8] Slocumb did not argue he would be entitled to relief under our state constitution's cruel and unusual punishments clause. *See* S.C. Const. art. I, § 15 ("[N]or shall cruel, nor corporal, nor unusual punishment be inflicted . . . ."). Accordingly, we do not address the import of state constitutional protections on Slocumb's sentence.

principles which may serve to illustrate it[] are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399–400 (1821) (emphasis added) (rejecting counsel's argument that the Supreme Court should follow the reasoning set forth in dicta in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)).  The principle enunciated by Chief Justice Marshall has particular force in this case, as a closer examination of the *Graham* majority and dissenting opinions illustrate.

**B.**

The *Graham* majority began its analysis by observing that "[t]he present case involves an issue the Court has not considered previously:  a categorical challenge *to a term-of-years sentence*." *Graham*, 560 U.S. at 61 (emphasis added).  The Supreme Court was thus presented with an opportunity to answer the very question Slocumb now presents.  Yet the Court—after a lengthy discussion of the changing "mores of society" and "the global consensus"[9]—answered a narrower question by only "hold[ing] that for a juvenile offender who did not commit homicide[,] the Eighth Amendment forbids the sentence of life without parole." *Id.* at 74.  To remove any question as to the holding in *Graham*, the majority concluded with: "The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." *Id.* at 82.

Underscoring its narrow holding and the rarity of sentencing juvenile nonhomicide offenders to life without the possibility of parole, the *Graham* majority discussed in detail the number of juveniles nationwide who were serving *de jure* life

---

[9] The so-called consensus against sentencing juvenile offenders to life without parole could not be found in the laws of this country, for the vast majority of states did not forbid such a sentence. *Graham*, 560 U.S. at 82–84 (including an Appendix to the majority opinion which listed thirty-seven states, the Federal Government, and the District of Columbia, all of which permitted *de jure* life sentences for juvenile nonhomicide offenders).  Undaunted, the Supreme Court stated that "[t]he evidence of consensus is not undermined by the fact that many jurisdictions do not prohibit life without parole for juvenile nonhomicide offenders." *Id.* at 66.  The *Graham* majority found the judgments of other nations "not irrelevant" in determining what the United States Constitution really means, finding persuasive "the global consensus against the sentencing practice in question." *Id.* at 80 (citation omitted).

sentences, counting 123 affected individuals. *Id.* at 62–64. Significantly, the Supreme Court *excluded* from its calculations the number of juveniles serving *de facto* life sentences due to a lengthy term of years. *See id.*; *id.* at 113 n.11 (Thomas, J., dissenting) (noting the majority opinion "exclude[d] from its analysis all juveniles sentenced to lengthy term-of-years sentences (*e.g.*, 70 or 80 years' imprisonment)," and finding the omission anomalous because "such a long sentence[ ] effectively denies the offender any material opportunity for parole," akin to the *de jure* life sentences the majority found prohibited). The Supreme Court made no attempt to quantify whether sentencing juveniles to *de facto* life sentences was "quite rare[]," as it did with those who received *de jure* life sentences. *See id.* at 64. As a result, *Graham*'s categorical bar was limited to those precise 123 juveniles counted by the Supreme Court and, in the future, to those juvenile nonhomicide offenders eligible to receive *de jure* life sentences for their crimes.[10]

Similarly, Justices Thomas and Alito both separately noted their understanding of the *Graham* majority's holding to exclude lengthy term-of-years sentences— statements which the majority failed to acknowledge or rebut. *See id.* at 124 (Alito, J., dissenting) ("Nothing in the Court's opinion affects the imposition of a sentence to a term of years without the possibility of parole."); *id.* at 113 n.11, 123 n.13 (Thomas, J., dissenting). Given the dissenting Justices' contemporaneous understanding of the reach of the majority decision—to which the majority did not respond—and because we are being asked to extend the explicit reach of *Graham* and find new Eighth Amendment protections, we decline Slocumb's invitation to broaden *Graham*'s holding.[11]

---

[10] Several other courts also have found this portion of *Graham* significant in exploring the limited reach of *Graham*'s holding. *See, e.g.*, *Bunch*, 685 F.3d at 552; *Lucero v. People*, 394 P.3d 1128, 1133 (Colo. 2017) (en banc), *cert. denied*, 138 S. Ct. 641 (2018); *State v. Nathan*, 522 S.W.3d 881, 887 n.10 (Mo. 2017) (en banc).

[11] A number of other courts have also found the *Graham* majority's failure to respond to those statements by Justices Thomas and Alito a telling sign as to the intended reach of its decision. *See, e.g.*, *Lucero*, 394 P.3d at 1133; *Adams v. State*, 707 S.E.2d 359, 365 (Ga. 2011); *State v. Brown*, 118 So.3d 332, 336, 341 (La. 2013); *Willbanks v. Dep't of Corr.*, 522 S.W.3d 238, 243 (Mo. 2017) (en banc), *cert. denied*, 138 S. Ct. 304 (2017); *Kinkel v. Persson*, 417 P.3d 401, 409–10 (Or. 2018), *cert. denied*, 139 S. Ct. 789 (2019); *Vasquez*, 781 S.E.2d at 925.

## C.

We do not deny the obvious—Slocumb's 130-year sentence is a *de facto* life sentence. The *Graham* Court acknowledged this was the question presented, but it chose not to answer the term-of-years sentencing issue, notwithstanding the dissenting opinions nipping at the heels of the majority on this very question.[12]

In emphasizing that Slocumb's situation is beyond the reach of *Graham*, it may be helpful to state the obvious: Slocumb's case is factually distinct from the circumstances presented in *Graham*. While the juvenile offender in *Graham* was convicted of a single crime and sentenced to a single sentence formally termed "life without parole,"[13] Slocumb committed multiple crimes at two different points in time—the second set after he had escaped from custody and, in the short time he was free, committed another strikingly similar set of crimes to the first one three years earlier. For these crimes, Slocumb received an average per-crime sentence of twenty-six years' imprisonment. The only reason his aggregate sentence exceeds his life expectancy is because he committed so many crimes, not because a single sentence is disproportionately lengthy.[14] Slocumb's case is nothing like *Graham*.

---

[12] Perhaps the narrow holding of *Graham* was necessary to garner a fifth vote. Regardless of the reasons, the holding of *Graham* is what it is and must be respected.

[13] To be precise, the juvenile in *Graham* was sentenced to fifteen years' imprisonment for one crime and a term of "life imprisonment" for a second, simultaneous crime in a jurisdiction that had abolished its parole system. *Graham*, 560 U.S. at 57. *But see id.* at 53 (describing the second crime as "a first-degree felony carrying a maximum penalty of life imprisonment without the possibility of parole"). We refer to the *Graham* defendant receiving a single life sentence for a single crime based on the second conviction, which was the Supreme Court's sole focus.

[14] *See O'Neil v. Vermont*, 144 U.S. 323, 331 (1892) ("If [a defendant sentenced to an aggregate sentence for multiple offenses] has subjected himself to a severe penalty, it is simply because he has committed a great many such offenses. It would scarcely be competent for a person to assail the constitutionality of the statute prescribing a punishment for burglary on the ground that had he committed so many burglaries that, if punishment for each were inflicted on him, he might be kept in prison for life. The mere fact that cumulative punishments may be imposed for distinct offenses in the same prosecution is not material upon this question. If the penalty were unreasonably severe for a single offense, the constitutional

*See Graham*, 560 U.S. at 63 ("The instant case concerns *only* those juvenile offenders sentenced to *life without parole* solely for *a* nonhomicide offense." (emphasis added)).[15]

Moreover, Slocumb's crimes reflect a critical difference from the juvenile offender in *Graham*: Slocumb shot his first victim in the face and head five times before leaving her to die on the side of a deserted country road. The *Graham* majority noted there was a moral distinction between defendants who intend to commit homicide and nonhomicide crimes. *See id.* at 69 ("The Court has recognized that defendants who do not kill, *intend to kill*, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers. . . . It follows that, when compared to an adult murderer, a juvenile offender who did not kill or *intend to kill* has a twice diminished moral culpability. The age of the offender *and the nature of the crime* each bear on the analysis." (emphasis added)). While Slocumb may have had a once-diminished moral culpability based solely on his age at the time he committed his offenses, we cannot agree he had a twice-diminished moral culpability like the juvenile offender in *Graham*.

Chief Justice Roberts noted this exact distinction in his concurrence in *Graham*, stating that while he agreed the *Graham* defendant could not be constitutionally sentenced to life without parole—and, thus, he concurred in the majority's result—the categorical bar against *de jure* life sentences for all juvenile nonhomicide

---

question might be urged; but here the unreasonableness is only in the number of offenses which the [defendant] has committed." (quotation marks omitted) (citation omitted)).

[15] Several other courts have found *Graham* and *Miller* distinguishable on the facts when a juvenile offender committed multiple crimes, committed a series of crimes at different points in time, and/or committed crimes against multiple victims. *See, e.g.*, *Bunch*, 685 F.3d at 551; *State v. Kasic*, 265 P.3d 410, 415 (Ariz. Ct. App. 2011); *Lucero*, 394 P.3d at 1132–34; *Brown*, 118 So. 3d at 341; *Willbanks*, 522 S.W.3d at 242; *Kinkel*, 417 P.3d 411–13; *Vasquez*, 781 S.E.2d at 925–26; *cf. Graham*, 560 U.S. at 63 (explaining juvenile offenders who commit both homicide and nonhomicide crimes "present a different situation for a sentencing judge than juvenile offenders who committed no homicide" because "[i]t is difficult to say that a defendant who receives a life sentence on a nonhomicide offense but who was at the same time convicted of homicide is not in some sense being punished in part for the homicide when the judge makes the sentencing determination").

offenders was an unnecessarily broad holding. *Id.* at 94 (Roberts, C.J., concurring). In particular, Chief Justice Roberts opined *de jure* life sentences would be appropriate for other "especially heinous or grotesque" crimes, such as in the case of a seventeen-year-old offender who raped an eight-year-old girl and left her to die buried under 197 pounds of rocks. *Id.* at 95 (Roberts, C.J., concurring). As Chief Justice Roberts stated, "The single fact of being 17 years old would not afford [the offender] protection against life without parole if the young girl had died—as [the offender] surely expected she would—so why should it do so when she miraculously survived his barbaric brutality?" *Id.*

## D.

For all of these reasons, we decline to extend *Graham*'s explicit holding based solely on the general rationale underlying the opinion without further input from the Supreme Court as to how the Eighth Amendment applies to situations where a juvenile nonhomicide offender commits multiple crimes against multiple victims at multiple points in time.[16] As explained by the United States Court of Appeals for the Sixth Circuit, a contrary result would lead to a number of unanswered questions:

> At what number of years would the Eighth Amendment become implicated in the sentencing of a juvenile: twenty, thirty, forty, fifty, some lesser or greater number? Would gain time be taken into account? Could the number vary from offender to offender based on race, gender, socioeconomic class or other criteria? Does the number of crimes matter? There is language in the *Graham* majority opinion that suggests that no matter the number of offenses or victims or type

---

[16] Approximately half of the courts around the country have similarly declined to find *Graham*, *Miller*, or the Eighth Amendment bars *de facto* life sentences. *See* Appendix, *infra*, Part I. However, notably, the other half of the courts around the country who considered this issue either found *Graham* or *Miller* expressly prohibited *de facto* life sentences or extended *Graham*'s and *Miller*'s rationale to bar the imposition of *de facto* life sentences on juvenile offenders. *See* Appendix, *infra*, Part II. We note there are three additional states who have disapproved of *de facto* life sentences for juvenile nonhomicide offenders under their state constitutions, rather than under *Graham*, *Miller*, or the Eighth Amendment. *See* Appendix, *infra*, Part III. Two other states declined to definitively hold whether *Graham* or *Miller* applied to *de facto* life sentences, but denied the juvenile offenders relief anyway for different reasons. *See* Appendix, *infra*, Part IV.

of crime, a juvenile may not receive a sentence that will cause him to spend his entire life incarcerated without a chance for rehabilitation, in which case it would make no logical difference whether the sentence is "life" or 107 years. Without any tools to work with, however, we can only apply *Graham* as it is written.

*Bunch*, 685 F.3d at 552 (citation omitted); *Vasquez*, 781 S.E.2d at 928 (explaining that answering this list of questions with any degree of specificity "would require a proactive exercise inconsistent with our commitment to traditional principles of judicial restraint"). As the Sixth Circuit concluded, "[I]f the Supreme Court has more in mind, it will have to say what that is." *Bunch*, 685 F.3d at 553 (citation omitted) (internal alteration marks omitted).

## IV.

The *Roper-Graham-Miller* trilogy has resulted in much confusion and conflicting opinions in ascertaining the reach of the Eighth Amendment in the sentencing of juveniles. *See* Appendix, *infra* (showing there is an approximately even split of authority on whether the Eighth Amendment, as interpreted in *Graham* and *Miller*, prohibits *de facto* life sentences). Courts have struggled in good faith in trying to determine the manner in which juveniles may be constitutionally sentenced. We are one of those courts. Rather than predict what the Supreme Court may or may not do, we believe the proper course is to respect the Supreme Court's admonition that lower courts must refrain from extending federal constitutional protections beyond the line drawn by the Supreme Court.

Our holding should in no way be read to signal the end of the debate on the underlying issues raised by aggregate term-of-years sentences imposed on juvenile offenders, whether for homicide or nonhomicide offenses. As the Supreme Court stated in *Graham* in the context of *de jure* life sentences for juveniles, it is for the states, in the first instance, to explore the means and mechanisms for complying with the Eighth Amendment. 560 U.S. at 75.

Many state legislatures have responded to *Roper*, *Graham*, and *Miller* by enacting juvenile sentencing statutes that provide juvenile offenders with a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. *See State v. Null*, 836 N.W.2d 41, 72 (Iowa 2013) (noting the "flurry of legislative action that has taken place in the wake of *Graham* and *Miller*"). Our General Assembly has already begun the process of considering a legislative response to juvenile sentencing concerns.

Specifically, the South Carolina General Assembly, with commendable foresight, has taken initial steps toward reforming juvenile sentencing practices in this state. In February 2019, the South Carolina House of Representatives introduced H. 3919 to enact the "Youth Sentencing Act of 2019."  H. 3919, 123 Leg., 1st Reg. Sess., as amended Feb. 8, 2019 (S.C. 2019), *available at* https://www.scstatehouse.gov/sess123_2019-2020/bills/3919.htm.  In its current form, the bill would: (1) retroactively prohibit juvenile offenders from being sentenced to life without parole; (2) retroactively provide juvenile nonhomicide offenders with parole-eligibility after twenty years' imprisonment, and juvenile homicide offenders with parole-eligibility after twenty-five years' imprisonment; (3) allow for sentences shorter than the mandatory minimums for juvenile nonhomicide offenders; (4) ban solitary confinement for all juvenile offenders; and (5) modify South Carolina's geriatric release program to allow for consideration of parole-like factors for juvenile offenders, *see Angel v. Commonwealth*, 704 S.E.2d 386, 402 (Va. 2011) (holding Virginia's geriatric release program—eligibility for which requires use of "the factors used in the normal parole consideration process"—satisfied *Graham*'s requirement for a meaningful opportunity for release based on demonstrated maturity and rehabilitation).

Respect for separation of powers compels us to recognize that the General Assembly is the author of our state's public policy for the sentencing of criminal offenders, juveniles and adults.  Pending further pronouncement from the Supreme Court, we take no position in the matter, nor should our holding be construed to limit or define the parameters of the legislative discussions and response to this challenge.  The judicial role is limited to answering the narrow question raised: whether the aggregate term-of-years sentence imposed on Slocumb categorically violates the Eighth Amendment pursuant to the reach of *Graham*.  Because we find it does not, our judicial prerogative is at its end, and the process must continue in the legislature.

## V.

Neither *Graham* nor the Eighth Amendment, as interpreted by the Supreme Court, currently prohibits the imposition of aggregate sentences for multiple offenses amounting to a *de facto* life sentence on a juvenile nonhomicide offender.  We therefore decline to provide Slocumb relief from his 130-year sentence stemming from his multiple and violent crimes.[17]

---

[17] As we have mentioned previously, our research indicates that jurisdictions around the country are approximately evenly split as to whether *Graham*'s and

**DECLARATORY JUDGMENT ISSUED.**

## Appendix

### I. Jurisdictions that find *Graham* or *Miller* does not apply to *de facto* life sentences

| | |
|---|---|
| United States Court of Appeals for the Fifth Circuit | *United States v. Walton*, 537 Fed. App'x 430, 437 (5th Cir. 2013) (finding *Graham* did not apply to a lengthy term-of-years sentence). |
| United States Court of Appeals for the Sixth Circuit | *Bunch v. Smith*, 685 F.3d 546, 550–53 (6th Cir. 2012) (explaining *Graham* "did not clearly establish that consecutive, fixed-term sentences for juveniles who commit multiple nonhomicide offenses are unconstitutional when they amount to the practical equivalent of life without parole"). |
| Arizona | *State v. Kasic*, 265 P.3d 410, 414–16 (Ariz. Ct. App. 2011) (opining *Graham* only applied to juvenile offenders who committed a *single* nonhomicide offense and were specifically sentenced to "life without parole" rather than a term of years). |
| Arkansas | *Hobbs v. Turner*, 431 S.W.3d 283, 289 (Ark. 2014) (determining a juvenile nonhomicide offender had received a sentence that complied with *Graham* so long as the sentence was "nonlife"). |
| Colorado | *Lucero v. People*, 394 P.3d 1128, 1132–34 (Colo. 2017) (noting the defendant, "unlike the petitioners in *Graham* and *Miller*, did not receive a sentence of life without the possibility of parole. Rather, he received four consecutive sentences to terms of years for four separate convictions. . . . Life without parole is a specific sentence, |

---

*Miller*'s holdings apply to *de facto* life sentences, with some denying relief and some granting relief. *See* note 16, *supra*; Appendix, *infra*. We are hopeful the Supreme Court will resolve this question, for it seems it cannot long remain true that **federal** constitutional protections vary so widely depending solely on the **state** in which a juvenile offender commits his offenses.

imposed as punishment for a single crime, which remains distinct from aggregate term-of-years sentences resulting from multiple convictions. Neither *Graham* nor *Miller* concerns or even considers aggregate term-of-years sentences."), *cert. denied*, 138 S. Ct. 641 (2018).

| | |
|---|---|
| Georgia | *Adams v. State*, 707 S.E.2d 359, 365 (Ga. 2011) (placing emphasis on Justice Alito's dissent in *Graham*, in which he stated that "nothing in the Court's opinion [in *Graham*] affects the imposition of a sentence to a term of years without the possibility of parole," *Graham*, 560 U.S. at 124 (Alito, J., dissenting) (internal alteration marks omitted)). |
| Illinois | *People v. Cavazos*, 40 N.E.3d 118, 139 (Ill. App. Ct. 2015) (rejecting *Miller*'s express applicability to *de facto* life sentences and "noting that there are distinct differences between a sentence of natural life without parole and a sentence of a determinate, albeit lengthy, number of years"). *But see People v. Reyes*, 63 N.E.3d 884, 887–88 (Ill. 2016) (per curiam) (agreeing with the State's concession that *Miller*'s rationale applies to **mandatory** term-of-years sentences that indisputably amount to life imprisonment in the case of a defendant who—because of statutory, firearm-sentencing enhancements—received the minimum possible sentence of ninety-seven years' imprisonment). |
| Kansas | *State v. Redmon*, 380 P.3d 718 (Kan. Ct. App. 2016) (per curiam) (citing *Bunch*, 685 F.3d at 552, for the proposition that applying *Graham* to *de facto* life sentences could result in confusion and uncertainty due to unanswered questions as to what number of years constituted a *de facto* life sentence; whether that number should be affected by race, gender, or socioeconomic status, as those factors all affect life expectancy; and whether the number of crimes committed should be taken into account), *cert. denied*, Aug. 24, 2017. |
| Louisiana | *State v. Brown*, 118 So. 3d 332, 341–42 (La. 2013) (concluding *Graham* did not apply to cases in which a |

|  |  |
|---|---|
|  | lengthy term-of-years sentence was the result of multiple convictions for which the sentences were imposed consecutively). |
| Minnesota | *State v. Ali*, 895 N.W.2d 237, 242, 244–46 (Minn. 2017) (declining to extend *Miller* to *de facto* life sentences resulting from multiple crimes and/or consecutive sentences), *cert. denied*, 138 S. Ct. 640 (2018). |
| Mississippi | *Mason v. State*, 235 So. 3d 129, 134–35 (Miss. Ct. App. 2017) (holding *Miller* only prohibited the imposition of a sentence of life without parole on a juvenile, not the fifty-year sentence the juvenile there received, and explaining life without parole sentences are legally distinguishable from term-of-years sentences in which the offender is eligible for good-time credit and the like), *cert. denied*, 233 So. 3d 821 (2018). |
| Missouri | *Willbanks v. Mo. Dep't of Corr.*, 522 S.W.3d 238, 243–46 (Mo. 2017) (en banc) (determining *Graham* did not apply when the lengthy sentence being challenged was an aggregate term-of-years that resulted from multiple convictions, as evidenced by Justice Alito's dissent in *Graham*, as well as Justice Thomas's observation in dissent that the *Graham* majority "exclude[d] from its analysis all juveniles sentenced to lengthy term-of-years sentences (*e.g.*, 70 or 80 years' imprisonment)," *Graham*, 560 U.S. at 113 n.11 (Thomas, J., dissenting)), *cert. denied*, 138 S. Ct. 304 (2017). |
| New York | *People v. Aponte*, 981 N.Y.S.2d 902, 905 (Sup. Ct. 2013) (determining *Miller* and *Graham* applied only to sentences of life without parole, and because the defendant remained technically parole-eligible despite "the prospect that the aggregate mandatory minimum periods of imprisonment may preclude him from ever being paroled," his sentence was not unconstitutional). |
| Oregon | *Kinkel v. Persson*, 417 P.3d 401, 409–13 (Or. 2018) ("To date, the [Supreme] Court has not extended its holdings in *Roper*, *Miller*, and *Graham* to lesser minimum sentences |

[than life without parole]. . . .  The [Supreme] Court neither considered nor decided in *Miller* and *Graham* how the categorical limitations that it announced for a single sentence for one conviction would apply to an aggregate sentences for multiple convictions."), *cert. denied*, 139 S. Ct. 789 (2019).

| | |
|---|---|
| Tennessee | *State v. Merritt*, No. M2012-00829-CCA-R3CD, 2013 WL 6505145, at *6 (Tenn. Crim. App. Dec. 10, 2013) (finding the defendant's sentence of 225 years' imprisonment was the equivalent of a life sentence, but that *Graham* did not apply to *de facto* life sentences, only to those actually termed "life imprisonment without the possibility of parole"). |
| Texas | *Teinert v. State*, No. 01-13-00088-CR, 2014 WL 554677, at *3 (Tex. App. Feb. 11, 2014) (explaining the holding in *Graham* was "narrowly tailored" to address sentences of life imprisonment without the possibility of parole for juveniles, and that *Graham* did not apply to "a sentence less severe than life"); *Diamond v. State*, 419 S.W.3d 435, 439–41 (Tex. App. 2012) (refusing to overturn a ninety-nine year sentence for aggravated robbery because the sentence was within the statutory range authorized by the state legislature, and failing to respond to the dissent's charge that such a sentence violated *Graham*). |
| Virginia | *Vasquez v. Commonwealth*, 781 S.E.2d 920, 925–26 (Va. 2016) (stating *Graham* did not address "multiple term-of-years sentences imposed on multiple crimes that, by virtue of the accumulation, exceeded the criminal defendant's life expectancy"; and declining to grant "precedential treatment to the 'reasoning' in *Graham*" because "the duty to follow binding precedent is fixed upon case-specific holdings, not general expressions in an opinion that exceed the scope of a specific holding"), *cert. denied*, 137 S. Ct. 568 (2016). |
| Wisconsin | *State v. Williams*, 842 N.W.2d 536 (Wis. Ct. App. 2013) (per curiam) (finding *Miller* inapplicable to a juvenile who would not be eligible for parole until he had served 101 |

years' imprisonment because he "was not subjected to a mandatory life-without-parole sentence").

## II. Jurisdictions that find *Graham* or *Miller* applies to *de facto* life sentences

| | |
|---|---|
| United States Court of Appeals for the Seventh Circuit | *McKinley v. Butler*, 809 F.3d 908, 911 (7th Cir. 2016) (finding that because the defendant was sentenced to a *de facto* life sentence, "the logic of *Miller* applies"). |
| United States Court of Appeals for the Ninth Circuit | *Moore v. Biter*, 725 F.3d 1184, 1194 (9th Cir. 2013) (determining that a *de facto* life sentence was irreconcilable with *Graham*'s mandate for juvenile nonhomicide offenders to be provided a meaningful opportunity to reenter society). |
| United States Court of Appeals for the Tenth Circuit | *Budder v. Addison*, 851 F.3d 1047, 1053–60 (10th Cir. 2017) (finding a sentence requiring the juvenile nonhomicide offender to serve 131.75 years before becoming eligible for parole violated the spirit and letter of *Graham*), *cert. denied*, 138 S. Ct. 475 (2017). |
| California | *People v. Caballero*, 282 P.3d 291, 295 (Cal. 2012) (holding a sentence requiring the offender to serve over 100 years before becoming parole-eligible did not allow the offender to demonstrate growth and maturity in an effort to secure release, in contravention of *Graham*'s dictate). |
| Connecticut | *Casiano v. Comm'r of Corr.*, 115 A.3d 1031, 1044 (Conn. 2015) (explaining the focus in *Graham* and *Miller* "was not on the label of a life sentence, but rather on whether a juvenile would, as a consequence of a lengthy sentence without the possibility of parole, actually be imprisoned for the rest of his life" (citations omitted) (internal quotation marks omitted)). |
| Florida | *Henry v. State*, 175 So. 3d 675, 680 (Fla. 2015) (opining "that the *Graham* Court had no intention of limiting its new categorical rule to sentences denominated under the exclusive term of 'life in prison'"). |

| | |
|---|---|
| Maryland | *Carter v. State*, 192 A.3d 695, 725 (Md. 2018) (determining the Eighth Amendment must prohibit *de facto* and *de jure* life sentences alike because "[o]therwise, the Eighth Amendment proscription against cruel and unusual punishment in the context of a juvenile offender could be circumvented simply by stating the sentence in numerical terms that exceed any reasonable life expectancy rather than labeling it a 'life' sentence"). |
| Montana | *Steilman v. Michael*, 407 P.3d 313, 319 (Mont. 2017) ("A strict application of the State's argument would mean that a sentence that inarguably would not allow for the offender to ever be released could not be considered a life sentence so long as the sentence is expressed in years. Logically, the requirement to consider how 'children are different' cannot be limited to *de jure* life sentences when a lengthy sentence denominated in a number of years will effectively result in the juvenile offender's imprisonment for life." (emphasis added)), *cert. denied*, 138 S. Ct. 1999 (2018). |
| Nevada | *State v. Boston*, 363 P.3d 453, 458 (Nev. 2015) (concluding its holding—that *Graham* applied to *de facto* life sentences—"best addresse[d] the concerns enunciated by the U.S. Supreme Court and this court regarding the culpability of juvenile offenders and the potential for growth and maturity of these offenders," but recognizing that such a holding "raise[d] complex and difficult issues, not the least of which [wa]s when will aggregate sentences be determined to be the functional equivalent of a sentence of life without the possibility of parole"). |
| New Jersey | *State v. Zuber*, 152 A.3d 197, 212, 214 (N.J. 2017) ("To be clear, we find that the force and logic of *Miller*'s concerns apply broadly:  to cases in which a defendant commits multiple offenses during a single criminal episode; to cases in which a defendant commits multiple offenses on different occasions; and to homicide and nonhomicide cases."; but rejecting the notion that sentencing judges should rely on general life-expectancy tables when determining the point at which a term-of-years sentence |

becomes a *de facto* life sentence: "Those tables rest on informed estimates, not firm dates, and the use of factors like race, gender, and income could raise constitutional issues."), *cert. denied*, 138 S. Ct. 152 (2017).

| | |
|---|---|
| New Mexico | *Ira v. Janecka*, 419 P.3d 161, 163, 166 (N.M. 2018) (determining the Eighth Amendment required consideration of "the cumulative impact of consecutive sentences on a juvenile," but that because the juvenile defendant would become eligible for parole at the age of sixty-two, he had already received a meaningful opportunity for release pursuant to *Graham*). |
| Ohio | *State v. Moore*, 76 N.E.3d 1127, 1140 (Ohio 2016) ("*Graham* cannot stand for the proposition that juveniles who do not commit homicide must serve longer terms in prison than the vast majority of juveniles who commit murder, who, because of *Miller*, are all but assured the opportunity to demonstrate maturity and rehabilitation at a meaningful point in their sentences."), *cert. denied*, 138 S. Ct. 62 (2017). We note the defendant in this case received a resentencing hearing, whereas his co-defendant—who was the subject of the Sixth Circuit's decision in *Bunch*—failed to receive similar relief. |
| Pennsylvania | *Commonwealth v. Foust*, 180 A.3d 416, 433–34, 436 (Pa. Super. Ct. 2018) (finding the logical inference of *Miller* was to prohibit *de facto* life sentences, but holding the impermissible *de facto* life sentence must be the result of a single term-of-years sentence, because otherwise "it would open the door to volume sentencing discounts in cases involving multiple juvenile homicide offenses. Juvenile perpetrators convicted of multiple homicides would routinely be subject to concurrent terms of imprisonment if the Commonwealth was unable to sustain its burden of proof under *Miller* . . . and juvenile offenders would receive volume discounts for their crimes."), *cert. requested*, Mar. 23, 2018. |
| Washington | *State v. Ramos*, 387 P.3d 650, 661 (Wash. 2017) ("Regardless of labeling, it is undisputed that [the juvenile |

defendant] was in fact sentenced to die in prison for homicide offenses he committed as a juvenile. *Miller* plainly provides that a juvenile homicide offender cannot be sentenced to die in prison without a meaningful opportunity to gain early release based on demonstrated rehabilitation unless the offender first receives a constitutionally adequate *Miller* hearing."), *cert. denied*, 138 S. Ct. 467 (2017).

Wyoming          *Bear Cloud v. State*, 334 P.3d 132, 141–42 (Wyo. 2014) (holding the teachings of *Roper*, *Graham*, and *Miller* require an individualized sentencing hearing when the juvenile defendant receives an aggregate, *de facto* life sentence, and stating, "To do otherwise would be to ignore the reality that lengthy aggregate sentences have the effect of mandating that a juvenile 'die in prison'" without consideration of his youth and its attendant characteristics (quoting *Miller*, 567 U.S. at 465)).

## III. Jurisdictions that find their state constitutions' cruel and unusual punishments clauses bar *de facto* life sentences

Indiana          *Brown v. State*, 10 N.E.3d 1, 4–8 (Ind. 2014) (disapproving of a 150-year sentence, and imposing instead an eighty-year sentence).

Iowa          *State v. Null*, 836 N.W.2d 41, 69–74 (Iowa 2013) (reaching its decision to extend *Miller*'s principles "independently under . . . the Iowa Constitution").

Massachusetts          *Commonwealth v. Perez*, 106 N.E.3d 620, 623 (Mass. 2018) (explaining the state constitution prohibited imposition of a later parole date for juvenile nonhomicide offenders than would otherwise be available for juvenile homicide offenders).

## IV. Jurisdictions that declined to rule on the applicability of *Graham* or *Miller* to *de facto* life sentences, but denied the juvenile offenders relief anyway

| | |
|---|---|
| Nebraska | *State v. Cardeilhac*, 876 N.W.2d 876, 888–90 (Neb. 2016) (rejecting—in the case of a juvenile offender who "was sentenced to imprisonment for a minimum of 60 years to life to be served consecutively to an 8- to 15-year sentence in a separate robbery case that he was already serving"—the juvenile's argument that *Miller* prohibited his lengthy sentence, because, alternatively, (1) the juvenile was not sentenced to "life without parole"; and (2) "in any event, he received the full benefit of *Miller* juvenile sentencing principles" due to his constitutionally-adequate sentencing hearing). |
| South Dakota | *State v. Springer*, 856 N.W.2d 460, 462, 470 (S.D. 2014) (finding the juvenile offender—who would become parole-eligible after serving thirty-three years of his 261-year sentence—failed to "establish a rule for what constitutes a *de facto* life sentence under which he is entitled to relief"; declining the juvenile offender's invitation for the court to craft its own rule defining the point a term-of-years sentence becomes a *de facto* life sentence; and "further declin[ing] the invitation to join jurisdictions holding *Roper*, *Graham*, and *Miller* applicable or inapplicable to *de facto* life sentences" because the juvenile offender would become parole-eligible at the age of 49 and therefore "did not receive life without parole or a *de facto* life sentence" (emphasis added)). |

**FEW and JAMES, JJ., concur.  HEARN, J., dissenting in a separate opinion in which BEATTY, C.J., concurs.**

**JUSTICE HEARN:** Respectfully, I dissent. I commend the majority's scholarly and well-written opinion and agree with much of its discussion on the trilogy of cases decided by the United States Supreme Court concerning punishment for juvenile offenders. However, I part company with the majority's belief that granting relief in

this case would impermissibly extend *Graham*.[18] Instead, as many other state supreme courts have held, I believe an aggregate sentence that amounts to a *de facto* life sentence falls within the scope of *Graham*.

Accordingly, I would follow the rationale of Maryland's highest court in *Carter*,[19] where in a similar context, the court explained that the justification underpinning *Graham* equally applies to a term-of-years sentence. *Carter*, 192 A.3d at 726 (citing *Graham*, 560 U.S. at 71 ("With respect to life without parole for juvenile nonhomicide offenders, none of the goals of penal sanctions that have been recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation…provides an adequate justification.")). In examining these basic pillars of criminal law, the *Carter* court noted, "A distinction between [a LWOP and a term-of-years sentence] makes no difference in terms of 'reconciliation with society,' 'denial of hope,' the 'incentive to become a responsible individual,' a 'chance of fulfillment outside of prison walls' or whether a prisoner 'will die in prison[.]'" *Id.* at 727 (quoting *Graham*, 560 U.S. at 79). I agree with this observation, and therefore, we cannot relinquish the protections provided by *Graham*—that Slocumb be afforded a "meaningful opportunity to obtain release." *Id.* at 75. Moreover, as we discussed in *Aiken*, youth has constitutional significance that must be thoroughly considered when the government incarcerates a juvenile for life. *Aiken v. Byars*, 410 S.C. 534, 543, 765 S.E.2d 572, 577 (2014).

Nevertheless, I do not necessarily quarrel with the sentence in this case, as Slocumb's offenses may very well constitute "truly horrifying" crimes that the *Graham* court noted could subject a juvenile to remain in prison for life. Further, Slocumb's extensive disciplinary history while incarcerated may demonstrate that he is "irredeemable." *See Graham*, 560 U.S. at 75 ("Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives."). However, before reaching that conclusion, Slocumb is entitled to the protections afforded by *Graham* and *Miller*. *See Aiken*, 410 S.C. at 543, 765 S.E.2d at 576–77 ("[I]t is the failure of a sentencing court to consider the hallmark features of youth prior to sentencing that offends the Constitution.").

Because I believe Slocumb's aggregate 130-year sentence is unconstitutional, the next question concerns the appropriate remedy. I agree with the majority that this

---

[18] *Graham v. Florida*, 560 U.S. 48 (2010).

[19] *Carter v. State*, 192 A.3d 695 (Md. 2018).

issue is best reserved for the General Assembly because that body is better equipped to fashion an appropriate solution in order to bring our juvenile sentencing scheme into constitutional compliance. To accomplish this task, courts and legislatures across the country have reached differing outcomes, including arbitrarily declaring a specific threshold—such as a 50-year sentence, implementing a parole system, using life expectancy tables, or a combination thereof. *See Carter*, 192 A.3d at 727–30 (discussing how courts across the country have resolved this issue). At this point, I would decline to adopt a specific approach and would delay implementation of my ruling until January 1, 2020, to provide the General Assembly with ample time to act in this area and to ensure our juvenile sentencing scheme complies with the Eighth Amendment.

**BEATTY, C.J., concurs.**